UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARQUIS THOMAS,

               Petitioner,                        Hon. Janet T. Neff

v.                                        Case No. 1:09-CV-864

BLAINE LAFLER,

               Respondent.

_____/

**REPORT AND RECOMMENDATION**

        This matter is before the Court on Thomas's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Thomas' petition be **denied**.

**BACKGROUND**

        As a result of events that occurred on June 1, 2006, Petitioner was charged with assault with the intent to commit murder and using a firearm during the commission of a felony. (Trial Transcript, January 29, 2007, 3, 39-40).  Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below.

**Carmela Cain**

On June 1, 2006, at approximately 6:00 p.m., Cain was playing badminton "in the area of" Martin Luther King Park in Grand Rapids. (Trial Transcript, January 30, 2007, 27-28). Cain was playing with her mother, her cousin, Michelle, and her husband, Quincy. (Tr. 28). While she was playing badminton, Cain heard multiple sounds that she thought were caused by fireworks. (Tr. 28-29). A "few seconds" later, Cain and her husband drove to the vicinity of Alexander and Fuller streets where the sounds originated. (Tr. 29-30).

When they arrived at this location, Cain observed Jermelle "standing in front of his car in the street" talking on a cell phone. (Tr. 30-32). When Cain exited her vehicle, Jermelle told her that "he was shot." (Tr. 32). It appeared to Cain that Jermelle had been shot in "his upper shoulder." (Tr. 32-33). When Cain asked Jermelle "did he need a ride," Jermelle "jumped in the back seat of [her] car." (Tr. 33). Cain immediately drove Jermelle to Saint Mary's Hospital. (Tr. 33). While Cain was driving to the hospital, her husband asked Jermelle "did he know who shot him?" (Tr. 36). Jermelle responded that he had been shot by his "bitch cousin, Buddy." (Tr. 37-38).

**Quincy Cain**

In the late afternoon of June 1, 2006, Cain was at Martin Luther King Park playing badminton. (Trial Transcript, January 30, 2007, 41-42). Shortly after arriving at the park, Cain heard gunshots. (Tr. 41-42). Cain and his wife then drove to the vicinity of Alexander and Fuller streets "to see what happened." (Tr. 42). When they arrived at that location, Cain's wife spotted Jermelle standing "in the driveway" of the residence at the corner of Alexander and Fuller. (Tr. 42-

2

43).  Jermelle indicated that he had been shot and agreed to be taken to the hospital by Cain and his

wife.  (Tr. 43-44).  To Cain, it appeared that Jermelle had been shot "somewhere around his chest

area."  (Tr. 44).  On the drive to the hospital, Cain's wife asked Jermelle "who done this to you?"

(Tr. 45).  Jermelle stated that he had been shot by his "bitch ass cousin, um, Buddy."  (Tr. 45).


**LaResha George**

On the evening of June 1, 2006, George was at Martin Luther King Park with several

of her younger cousins.  (Trial Transcript, January 30, 2007, 52-54).  At some point, George heard

a gunshot.  After grabbing her cousins and "jump[ing] to the ground," George looked toward Fuller

Street where she saw a white car.  (Tr. 54-56).  George was unable to see who or how many people

were in this vehicle.  (Tr. 60).  George watched the vehicle proceed through a stop sign and continue

on Fuller Street.  (Tr. 60-61).  George did not see who had been shot.  (Tr. 61-65).


**Ynes Lee**

Lee is Petitioner's aunt.  (Trial Transcript, January 30, 2007, 70-71).  According to

Lee, Petitioner has been known by the nickname, Buddy, "since he was little."  (Tr. 72).  Lee is

cousins with Jermelle Stokes and also has a niece named, Felita.  (Tr. 70, 73).

On or about June 1, 2006, Lee agreed to rent a car for Petitioner and Felita because

"they were going out of town" and did not have a credit card.  (Tr. 72-75).  The following day, Lee

saw a news story about a shooting in the vicinity of Alexander and Fuller streets, where Jermelle

lived.  (Tr. 75-79).  The news story included a discussion of a particular vehicle which Lee surmised

was the same car she had rented for Petitioner.  (Tr. 75-79).  Lee then attempted without success to

contact Petitioner or Felita.  (Tr. 76).  The car was later located on Cass Street, approximately five houses away from Felita's residence.  (Tr. 76-77).

**Jermelle Stokes**

On the afternoon of June 1, 2006, Stokes was at a friend's house on Benjamin Street. (Trial Transcript, January 30, 2007, 90-91).  While Stokes was at this location, Petitioner drove by in a white Pontiac Grand Prix.  (Tr. 89-91).  Stokes saw three other people in Petitioner's vehicle, one of whom was Dwayne Scott.  (Tr. 91-92).

A short time later that day, Stokes was standing in front of his car near the intersection of Alexander and Fuller streets.  (Tr. 87-88).  Stokes was waiting for Sean Johnson to return home.  (Tr. 87-88).  While Stokes was waiting for Johnson to return home, he was approached by Mitch, a "childhood buddy," who was "in the park."  (Tr. 88-89).  As Stokes was speaking with Mitch, Petitioner drove up in a white Pontiac Grand Prix and stopped next to Stokes' vehicle.  (Tr. 93-96).  Stokes also saw Dwayne Scott and Willie Bracey in the car with Petitioner.  (Tr. 97).

Petitioner stated to Stokes, "Cuz, that's how you feel, you - - you think I got something to do with this?"  (Tr. 96).  Stokes believed that Petitioner was referring to the fact that Petitioner was a suspect in the break-in of Stokes' residence the previous December.  (Tr. 97-98). Petitioner and Stokes then began yelling back and forth.  (Tr. 96).  Petitioner then pulled out a gun, stated, "this is for the fam," and fired several shots at Stokes.  (Tr. 96-102).  Petitioner then drove away.  (Tr. 101-02).

A few minutes later, Stokes called his mother on his cell phone and told her what happened.  (Tr. 102, 109).  Shortly thereafter, Carmela Cain arrived on the scene and drove Stokes

to the hospital.  (Tr. 102-03).  On the drive to the hospital, Stokes received a telephone call from his aunt, Annette Moore.  (Tr. 103).  After arriving at the hospital, Stokes initially stated that he did not know who shot him.  (Tr. 104).  Stokes said this because he was "shocked" and "just couldn't believe that [his] cousin did this to [him]."  (Tr. 104).  Stokes was also concerned about "telling on" a family member and wanted to protect his cousin.  (Tr. 104-05, 164-65).  When he was later interviewed by the police, Stokes, at the urging of Annette Moore, informed the officer that he had been shot by Petitioner.  (Tr. 105).

**Annette Moore**

Sometime during the evening of June 1, 2006, Moore received a telephone call from Jermelle Stokes' mother informing her that Jermelle had been shot.  (Trial Transcript, January 30, 2007, 169-71).  Approximately five minutes later, Moore telephoned Stokes.  (Tr. 171).  When Moore asked Stokes what happened, Stokes replied that "Buddy had shot him."  (Tr. 172).  Moore testified that Petitioner was known by the nickname, Buddy.  (Tr. 172).

After arriving at the hospital, Moore was approached by a police officer who informed her that Stokes had stated that he did not know who shot him.  (Tr. 174).  Moore responded that she knew who shot Stokes because Stokes had told her.  (Tr. 174).  A short time later, Moore was permitted to visit with Stokes.  (Tr. 174).  Moore told Stokes to "tell the truth, tell them who did it," at which point Stokes stated that he had been shot by Petitioner.  (Tr. 174-75).  On or about August 17, 2006, Moore received a letter from Petitioner in which he apologized for "what happened."  (Tr. 175-76).

**Gretchen Ross**

As of June 2, 2006, Ross was employed by the Grand Rapids Police Department as a crime scene technician and a latent print technician. (Trial Transcript, January 31, 2007, 16-21). At approximately noon that day, Ross was dispatched to investigate a white Pontiac Grand Prix. (Tr. 21-23). An investigation of the vehicle revealed Petitioner's fingerprint on the exterior of the passenger side rear door. (Tr. 30).

**Cecile Herald**

As of June 2, 2006, Herald was employed as the Forensic Services Manager for the Grand Rapids Police Department. (Trial Transcript, January 31, 2007, 56-57). In addition to managing the crime scene technicians and latent print examiners, Herald works as a crime scene technician when the department is "short staffed." (Tr. 57). On June 2, 2006, Herald assisted Gretchen Ross process a white Pontiac Grand Prix that was believed to have been involved in a shooting. (Tr. 57-59). Specifically, Herald collected evidence with a gunshot residue kit. (Tr. 58-62). Herald collected this evidence from throughout the front and rear areas of the vehicle. (Tr. 63-64). After the collection of this evidence, the gunshot residue kit was sent to the R. J. Lee Group for analysis. (Tr. 60-61).

**Elana Foster**

As of June 2, 2006, Foster was employed as a forensic chemist with the R. J. Lee Group. (Trial Transcript, January 31, 2007, 69-70). Foster was permitted to testify as an expert witness in the area of gunshot residue analysis. (Tr. 70-71). Foster analyzed the evidence recovered

6

by Cecile Herald.  (Tr. 74).  Foster discovered gunshot residue on all the samples provided by Herald.  (Tr. 80).  According to Foster, when a weapon is fired within a vehicle gunshot residue is found "throughout the entire vehicle."  (Tr. 81-82).

**Paul Pena**

As of June 2, 2006, Pena was employed as an officer with the Wyoming Police Department working the 9:00 p.m. to 7:00 a.m. shift.  (Trial Transcript, January 31, 2007, 95).  At approximately 2:30 a.m. on June 2, 2006, Pena received a call from Officer Kamstra "to apprehend some individuals that ran from him."  (Tr. 95-96).  Officer Pena immediately proceeded to the vicinity of 2900 Taft Street where he soon discovered Petitioner hiding underneath a vehicle.  (Tr. 96-97).  After taking Plaintiff into custody, Pena discovered that Petitioner was carrying a portable handheld scanner used to monitor police broadcasts.  (Tr. 97-100).

**A.J. Hite**

As of June 1, 2006, Hite was employed as a detective for the Grand Rapids Police Department.  (Trial Transcript, January 31, 2007, 108-09).  On June 2, 2006, Detective Hite was assigned to investigate the shooting of Jermelle Stokes.  (Tr. 109-10).  At approximately 11:00 a.m. that morning, Detective Hite interviewed Petitioner, who had been arrested earlier in the day.  (Tr. 111-15).  At the outset of the interview, Detective Hite informed Petitioner of his *Miranda* rights. (Tr. 113-15).  Petitioner agreed to waive his right to remain silent and speak with Detective Hite. (Tr. 112-15).  A recording of this interview was played for the jury.  (Tr. 116).[1]

---

[1]   A transcript of this interview is located in the record.  (Dkt. #11).

**LaToya Covington**

Covington is Jermelle Stokes' sister and Petitioner's cousin.  (Trial Transcript, January 31, 2007, 145-46).  Covington received a letter from Petitioner that he wrote while confined in the Kent County Jail.  (Tr. 147-48).  The letter was admitted into evidence and published to the jury.[2]  (Tr. 148-50).

**Dr. Stanley Sherman**

As of June 1, 2006, Dr. Sherman was employed as a trauma surgeon at Saint Mary's Hospital.  (Trial Transcript, February 1, 2007, 18-21).  On that date, Dr. Sherman was part of the trauma team that treated Jermelle Stokes' gunshot wounds.  (Tr. 21-22).  Upon admission, Stokes was suffering from four "penetrating injuries that were potentially life threatening."  (Tr. 21-26).  As part of his treatment, Stokes underwent a toxicology screen the results of which were positive for opiates.  (Tr. 27-29).  Dr. Sherman indicated that Vicodin, which Stokes reported that he was presently taking, was an opiate and would produce a positive result for opiates on a toxicology screen.  (Tr. 28-29).  Stokes did not, however, appear to be impaired.  (Tr. 45-46).

**Dean Garrison**

As of June 1, 2006, Garrison was employed as a crime scene technician for the Grand Rapids Police Department.  (Trial Transcript, February 1, 2007, 50-51).  At approximately 7:20 p.m. that evening, Officer Garrison was dispatched to the residence at the intersection of Alexander and Fuller streets to investigate a shooting.  (Tr. 51-52).  An investigation of the scene revealed that four

---

[2]   The record does not appear to contain a copy of this letter.

bullets struck the exterior of the garage.  (Tr. 52-63).  Garrison discovered what appeared to be blood in the driveway and on the exterior of the garage.  (Tr. 54-63).  Garrison also discovered a "deformed bullet" at the scene.  (Tr. 60).

**Debora Covington Jackson**

Jackson is Jermelle Stokes' mother and Petitioner's great aunt.  (Trial Transcript, February 1, 2007, 83-84).  At approximately 7:15 p.m. on June 1, 2006, Stokes called Jackson and stated, "Momma, Buddy just shot me."  (Tr. 84-85).  Jackson testified that Petitioner's nickname is Buddy.  (Tr. 86).  On or about August 28, 2006, Jackson received a letter from Petitioner.  (Tr. 87-89).  In this letter, Petitioner stated that he was "sorry" for "what [he] did to the family."  (Tr. 91-94).

Following the presentation of evidence, the jury found Petitioner guilty of assault with the intent to commit murder and using a firearm during the commission of a felony.  (Trial Transcript, February 2, 2007, 117).  Petitioner was sentenced to serve 12-40 years in prison on the assault conviction and two years on the firearm conviction.  (Sentencing Transcript, March 26, 2007, 12).  Petitioner appealed his convictions in the Michigan Court of Appeals, asserting the following claims:

> I.    The court erred by not allowing the defense to present extrinsic evidence to establish that the complainant was a drug dealer and thus could have been a target of others and by not allowing the defense to cross-examine the complainant on whether he blamed defendant for the loss of drug proceed money and thus had a motive to falsely accuse defendant.  The court's rulings violated the defendant's constitutional rights to present a defense and to confrontation.

9

II.    Mr. Thomas' constitutional rights to effective assistance of counsel were violated where defense counsel opened the door to otherwise inadmissible hearsay.

III.    The prosecutor's misconduct in his rebuttal closing arguments, improperly prejudiced the defendant and therefore tended to mislead or confuse the jury as to the sufficiency of evidence necessary to convict the defendant.

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. Thomas*, 2008 WL 4274401 (Mich. Ct. App., Sept. 18, 2008). Asserting the same claims, Petitioner moved in the Michigan Supreme Court for leave to appeal. The court denied Petitioner's request, stating that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. Thomas,* No. 137504, Order (Mich., January 9, 2009). On September 18, 2009, Petitioner initiated the present action in which he asserts the three claims identified above.

## STANDARD OF REVIEW

Thomas' petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

(d)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or

10

(2)      resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at an opposite result." *Ayers v. Hudson*, 623 F.3d 301, 307 (6th Cir. 2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at

11

411.  Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable.  *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12.  Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case" or if it "either unreasonably extends or unreasonably refuses to extend a legal principle from the Supreme Court precedent to a new context."  *Ayers*, 623 F.3d at 307. Furthermore, review under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits."  *Cullen v. Pinholster*, - - - S.Ct. - - -, 2011 WL 1225705 at *8 (Apr. 4, 2011).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the "factual determination by [the] state courts are presumed correct absent clear and convincing evidence to the contrary."  *Ayers*, 623 F.3d at 308.  Accordingly, a decision "adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." While this standard is "demanding" it is "not insatiable."  *Id.*

For a writ to issue pursuant to § 2254(d)(1), the Court must find a violation of clearly established federal law "as set forth by the Supreme Court at the time the state court rendered its decision."  *Stewart v. Irwin*, 503 F.3d 488, 493 (6th Cir. 2007).  This definition of "clearly established federal law" includes "only the holdings of the Supreme Court, rather than its dicta." *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  Nevertheless, "the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue."

*Stewart*, 503 F.3d at 493.

As previously noted, § 2254(d) provides that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits" unless the petitioner can satisfy the requirements of either § 2254(d)(1) or § 2254(d)(2). This provision, however, "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011). Instead, when a federal claim has been presented to a state court and the state court has denied relief, "it may be presumed that the state court adjudicated the claim on the merits." *Id.* at 784-85. Where such is the case, the Court must apply the deferential standard of review articulated above, rather than some other less deferential standard.

The presumption that the state court "adjudicated [a] claim on the merits" may be overcome only "when there is reason to think some other explanation for the state court's decision is more likely." *Id.* If this presumption is overcome, however, the Court reviews the matter de novo. *See Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *see also, Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

### I.        Right to Present a Defense

At trial, Petitioner sought to introduce extrinsic evidence that Jermelle Stokes was a drug dealer. Petitioner asserted that the evidence in question was relevant because it demonstrated

that Stokes was involved in a dangerous activity that may have precipitated Stokes' shooting. (Trial Transcript, January 31, 2007, 157-61). Petitioner also asserted that establishing that Stokes was a drug dealer was relevant in that it supported the theory that Stokes falsely identified Petitioner as his assailant because Petitioner owed Stokes several thousand dollars in a drug-related debt. (Trial Transcript, February 1, 2007, 8-17, 103-07, 155-58).

The trial judge denied Petitioner's request to explore this issue through a collateral witness. (Trial Transcript, February 1, 2007, 103-07, 155-58). The judge ruled that Petitioner was permitted to ask Stokes if he was "involved in drug trafficking." (Tr. 156). If Stokes responded in the affirmative, Petitioner would be permitted to then ask Stokes "whether it was true or not that defendant, Thomas, owed Mr. Stokes money as a result of a drug transaction." (Tr. 156). The judge further ruled, however, that if Stokes denied being involved in drug trafficking, the court "was not going to allow impeachment by collateral witnesses testifying as to collateral bad acts" as such would violate Michigan Rules of Evidence 608 and 609. (Trial Transcript, February 1, 2007, 103-07, 155-58). Petitioner asserts that the trial judge's denial of his request to introduce extrinsic evidence that Jermelle Stokes was a drug dealer violated his constitutional right to present a defense.

The United States Constitution guarantees to criminal defendants "a meaningful opportunity to present a complete defense." *United States v. Geisen*, 612 F.3d 471, 495 (6th Cir. 2010) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)). This right is not without limits, however, and may be reasonably restricted "to accommodate other legitimate interests in the criminal trial process." *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *see also*, *Taylor v. Illinois*, 484 U.S. 400, 412-13 (1988) ("[t]he Sixth Amendment does not confer the right to present testimony free from the legitimate demands of the adversarial system"); *Couturier v. Vasbinder*, 385

14

Fed. Appx. 509, 516 (6th Cir., July 13, 2010) ("the right to present a complete defense is not an unlimited right to ride roughshod over reasonable evidentiary restrictions") (citation omitted).  It is well accepted that the Federal Rules of Evidence constitute "reasonable restrictions" on a criminal defendant's ability to introduce evidence.  *See, e.g., Geisen*, 612 F.3d at 495; *United States v. Armstrong*, 2011 WL 3792363 at *4 (6th Cir., Aug. 26, 2011).  In this respect, the Court notes that Michigan Rules of Evidence 404(b) and 608(b) mirror Federal Rules of Evidence 404(b) and 608(b).

Accordingly, criminal defendants "must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Wynne v. Renico*, 606 F.3d 867, 870 (6th Cir. 2010) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)).  The application of such rules does not abridge an accused's right to present a defense so long as they are not "arbitrary or disproportionate to the purposes they are designed to serve." *Renico*, 606 F.3d at 870 (quoting *Scheffer*, 523 U.S. at 308).  As is well recognized, trial judges must make many evidentiary rulings during the course of a trial and "the Constitution leaves to the judges who must make these decisions wide latitude to exclude evidence that is repetitive, only marginally relevant or poses an undue risk of harassment, prejudice, or confusion of the issues." *Crane*, 476 U.S. at 689-90.

The Michigan Court of Appeals rejected Petitioner's argument on this issue, specifically concluding as follows:

> It is within the trial court's discretion to decide whether to admit evidence.  MRE 608(b) generally prohibits impeachment of a witness by extrinsic evidence regarding collateral, irrelevant, or immaterial matters.  Extrinsic evidence is "[e]vidence that is calculated to impeach a witness's credibility, adduced by means other than cross-examination of the witness." Unless the impeachment involves a matter closely bearing on the defendant's guilt or innocence, counsel is required to accept an answer given by a witness on

cross-examination regarding a collateral matter.

> Here, defendant sought to introduce witness testimony that the victim is a drug dealer.  Although defendant argues that the extrinsic evidence was necessary to his defense, to show that other people may have been motivated to shoot the victim, the proposed evidence would not show bias so much as reveal irrelevant bad acts by the victim, which is inadmissible character evidence.  It does not logically follow that a drug dealer may be shot simply because of his status as a drug dealer, although that certainly could be a hazard of the activity.  Defendant did not identify another person or persons who had a conflict with the victim because of the victim's alleged status as a drug dealer, and thus the fact that the victim may have been susceptible to being shot because he is a drug dealer is speculative and irrelevant, and did not closely bear on defendant's guilt or innocence.  The trial court properly excluded extrinsic evidence regarding defendant's alleged drug-dealing activities.

*Thomas*, 2008 WL 4274401 at *1 (internal citations omitted).

The trial judge's evidentiary ruling on this issue was not arbitrary, but was instead a reasonable application of the relevant rules of evidence.  As such, the trial judge's rulings constituted a reasonable restriction on Petitioner's ability to present a defense.  Accordingly, the rejection of this particular claim is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  It is likewise not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

## II.        Confrontation Clause

At trial, Petitioner sought to ask Jermelle Stokes whether he was upset with Petitioner for losing several ounces of cocaine, worth approximately three thousand dollars, that Stokes entrusted to Petitioner.  (Trial Transcript, January 30, 2007, 112-20).  Petitioner asserts that this

16

particular line of questioning was relevant to show that Stokes was biased and had motivation to falsely accuse Petitioner of shooting him.  The trial judge ruled that Petitioner could ask Stokes if he was a drug dealer, but that if Stokes denied such Petitioner could not impeach Stokes with extrinsic evidence as such would violate Michigan Rule of Evidence 608(b).  (Tr. 112-14). Petitioner asserts that the trial judge's evidentiary ruling violated his constitutional right to confront the witnesses against him.

The Confrontation Clause of the Sixth Amendment, applied to the states through the Fourteenth Amendment, *see Pointer v. Texas*, 380 U.S. 400, 403-05 (1965), guarantees to every criminal defendant the right "to be confronted with the witnesses against him." *Cruz v. New York*, 481 U.S. 186, 189 (1987).  This right entitles the accused to see the witnesses against him face-to-face, and to hear their testimony.  *See Dowdell v. United States*, 221 U.S. 325, 329-30 (1911) (adequate confrontation requires that the accused have the opportunity to see the witnesses against him face-to-face at trial).[3]

The Confrontation Clause insures that each witness "will give his statements under oath - thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury." *Lee v. Illinois*, 476 U.S. 530, 540 (1986).  It also permits the jury to observe the witnesses, enabling them to judge by their demeanor on the stand whether they are worthy of belief.  *See Mattox v. United States*, 156 U.S. 237, 242-43 (1895).  The primary right secured by the Confrontation Clause, however, is the right to cross-examine witnesses.  *See Ohio v. Roberts*, 448 U.S. 56, 63 (1980).  The importance of the right to cross-examine adverse witnesses

---

[3]  The Supreme Court has recognized a very limited exception to the requirement of physical, face-to-face, confrontation.  *See Maryland v. Craig*, 497 U.S. 836 (1990) (remote testimony by child assault victim, using closed circuit video monitor, is acceptable if the child would suffer trauma as a result of face-to-face confrontation).

cannot be overstated.  As is well recognized, cross-examination is the "greatest legal engine ever invented for the discovery of truth."  *California v. Green*, 399 U.S. 149, 158 (1970).

In this respect, it is recognized that "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination."  *Davis v. Alaska*, 415 U.S. 308, 316-17 (1974); *see also*, *Pennsylvania v. Ritchie*, 480 U.S. 39, 51-52 (1987) ("[o]f course, the right to cross-examine includes the opportunity to show that a witness is biased, or that testimony is exaggerated or unbelievable").  Nevertheless, the "Sixth Amendment does not require that the defendant have an unlimited opportunity to show bias." *United States v. Banks*, 151 Fed. Appx. 418, 426 (6th Cir., Oct. 11, 2005).  As the Supreme Court has observed:

> It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness.  On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.  And as we observed earlier this Term, "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."

*Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

While Petitioner was prevented from asking Stokes whether he once provided Petitioner with several ounces of cocaine, Petitioner was permitted to explore whether Stokes harbored any bias toward Petitioner as a result of Petitioner allegedly losing several thousand dollars worth of Stokes' property.  On cross-examination of Stokes, the following exchange occurred between Stokes and Petitioner's attorney:

Q:     Tell me, have you ever been engaged in any business endeavors with Marquis?

A:     Excuse me?

Q:     Have you ever been engaged in any business endeavors with Marquis?

A:     No, sir.

Q:     Okay.  Isn't it true that, oh, before this incident occurred, you entrusted to Marquis' care some property of yours worth approximately $3,000, [that you] subsequently were told, anyway, had been stolen or robbed from Marquis?

A:     Can you rephrase that again?

Q:     Sure.  Isn't it true that sometime before this incident, you were told that - excuse me, that you entrusted to Marquis some property that belonged to you that was valued at approximately $3,000, and that you were later, at least, told that it was stolen or robbed from Marquis?

A:     No, sir.  Last time we were here you said that I owed -

Q:     Let's not go back to the last time, please.  There's some primers of legal rules that we -

       The Court:     Just answer the questions.

A:     No.

       The Court:     And if Mr. Becker needs to clear it up -

A:     No, no, no, sir.

Q:     Okay, so you've never entrusted to him any property -

A:     No, sir.

Q:     - of yours worth $3,000?

19

> A:      No, sir.
>
> Q:      Never in your life?
>
> A:      No.

(Trial Transcript, January 30, 2007, 148-49).

As this exchange reveals, Petitioner was not prevented from exploring Stokes' potential bias. Instead, Petitioner was merely prevented from exploring this issue in a manner that, as discussed above, violated other legitimate and reasonable concerns. As the Supreme Court has observed, a trial court's limitation on cross-examination concerning a witness' potential bias violates the Confrontation Clause if the defendant "was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors. . .could appropriately draw inferences relating to the reliability of the witness.'" *Van Arsdall*, 475 U.S. at 680 (quoting *Davis*, 415 U.S. at 318)). This standard is satisfied where "[a] reasonable jury might have received a significantly different impression of [the witness'] credibility had [defendant's] counsel been permitted to pursue his proposed line of cross-examination." *Van Arsdall*, 475 U.S. at 680.

The Michigan Court of Appeals rejected Petitioner's argument on this issue, stating as follows:

> Defendant also argues that he was deprived of his constitutional right to confront the witnesses against him when the trial court limited defendant's cross-examination of the victim, specifically not allowing defense counsel to inquire whether defendant lost $3,000 of cocaine belonging to the victim. A defendant has a federal and state constitutional right to confront witnesses against him. The Confrontation Clause, however, only guarantees the defendant a reasonable opportunity to test the truth of a witness' testimony. "A primary interest secured by the Confrontation Clause is the right of cross-examination." The Confrontation Clause "guarantees an

20

*opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."

No violation of the Confrontation Clause occurred in this case. Defendant had the opportunity to cross-examine the victim, and was able to ask the victim whether defendant lost his property, without bringing in irrelevant bad character evidence about $3,000 worth of cocaine belonging to the victim. Defendant claims that the questions he wanted to ask were designed to reveal the victim's motive, bias, or prejudice. We conclude that it was not necessary to specify the illegal nature of the property in order to ferret out the victim's motive, bias, or prejudice. The trial court allowed defendant to inquire into matters that could have revealed the victim's bias against defendant. We find that the Confrontation Clause was not violated by the restriction placed on questioning.

*Thomas*, 2008 WL 4274401 at *2 (internal citations omitted).

The decision by the Michigan Court of Appeals rejecting this claim is neither contrary to, nor involves an unreasonable application of, clearly established federal law. It is likewise not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

**III.        Ineffective Assistance of Counsel**

Petitioner asserts that his right to the effective assistance of counsel was violated when his trial attorney "opened the door to otherwise inadmissible hearsay testimony."

To establish ineffective assistance of counsel, Petitioner must show both deficient performance by his counsel and prejudice resulting therefrom. *See Premo v. Moore*, 131 S.Ct. 733, 739 (2011). To establish deficient performance, Petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *Premo*, 131 S.Ct. at 739 (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)). A court considering a claim of ineffective assistance

must apply a "strong presumption that counsel's representation was within the 'wide range' of reasonable professional assistance." *Premo*, 131 S.Ct. at 739 (quoting *Strickland*, 466 U.S. at 689). Petitioner's burden is to show that "counsel made errors so serious that [she] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Premo*, 131 S.Ct. at 739 (quoting *Strickland*, 466 U.S. at 687).

Petitioner must further establish that he suffered prejudice as a result of his attorney's allegedly deficient performance. Prejudice, in this context, has been defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Premo*, 131 S.Ct. at 739 (quoting *Padilla v. Kentucky*, 130 S.Ct. 1473, 1485 (2010)); *see also*, *Mahdi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008). The issue is whether counsel's representation "amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Premo*, 131 S.Ct. at 739 (quoting *Strickland*, 466 U.S. at 690). This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory." *Jacobs v. Mohr*, 265 F.3d 407, 418 (6th Cir. 2001).

As the Supreme Court has made clear, even when reviewing an ineffective assistance of counsel claim *de novo*, "the standard for judging counsel's representation is a most deferential one." *Premo*, 131 S.Ct. at 740. Likewise, the standard by which petitions for habeas relief are judged is "highly deferential." Thus, when reviewing, in the context of a habeas petition, whether a state court unreasonably applied the *Strickland* standard, review is "doubly" deferential. *Id.* (citations omitted). As the Supreme Court recently concluded:

> The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against

the danger of equating reasonableness under *Strickland* with
unreasonableness under § 2254(d).  When § 2254(d) applies, the
question is not whether counsel's actions were reasonable.  The
question is whether there is any reasonable argument that counsel
satisfied *Strickland*'s deferential standard.

*Id.* (internal citations omitted).

The events on which this particular claim is based occurred during Petitioner's cross-

examination of Detective Hite.  The specific exchange in question was as follows:

Q:    I would like to talk to you about your testimony
      where you talked about a poker ploy or bluffing.

A:    Yes, sir.

Q:    Basically you lied to him about it, correct?

A:    Correct, sir.

Q:    You told him there were all kinds of other civilians
      out there, that didn't have anything to do with this
      case, who had picked him out of a lineup?

A:    Correct, sir.

Q:    That was absolutely false.

A:    That was absolutely false, sir.

Q:    The only one who has ever ID'd him and claimed to
      be an eyewitness to Mr. Thomas shooting Jermelle is
      Jermelle, correct?

A:    Correct, sir.

Q:    Everybody else who may have claimed that Marquis
      shot Jermelle only knows that because Jermelle told
      them or someone who Jermelle told told them,
      correct?

A:    That's not correct, sir.

Q:      Okay.  Why not?

Prosecutor:      I guess we have to approach.

Defense Counsel:      Okay.

The Court:      All right.

(conference at bench off record)

The Court:      Answer the question.

A:      The answer to that question was no, because he, the defendant, Marquis, told - him and his aunt had a discussion about it.  She told him it was wrong, something to the effect that it was wrong for him to shoot him.  He said he didn't know why he shot Jermelle.

Q:      That's what the aunt said?

A:      That's correct, sir.

Q:      That wasn't [Marquis] saying, "I don't know why I shot Jermelle?"

A:      No, sir.

Q:      And is it possible that perhaps she misunderstood Marquis; namely, that he could have said to her something like, "I don't know why people are saying I shot Jermelle?"  Anything is possible, correct?

A:      Yeah, anything is possible.

(Trial Transcript, January 31, 2007, 121-23).

Even if the Court assumes that counsel was deficient for eliciting from Detective Hite

that Petitioner allegedly told his aunt that he shot Jermelle Stokes, Petitioner cannot demonstrate that

he suffered prejudice as a result as the other evidence of Petitioner's guilt was substantial.  As the

Michigan Court of Appeals concluded in rejecting this claim:

24

Further, even assuming that defense counsel made a tactical error by eliciting the statement, defendant's ineffective assistance of counsel claim fails. Defendant has failed to show that, but for trial counsel's errors, there is a reasonable probability that the results of defendant's trial or sentencing would have been different, and that the proceedings were fundamentally unfair or unreliable. The evidence presented overwhelmingly supported the jury's verdict of guilt. The victim testified that defendant shot him, numerous witnesses testified that the victim told them that defendant shot him, and fingerprint evidence placed defendant in the car involved in the shooting. In light of this evidence, we cannot conclude that but for the admission of the aunt's statement, the outcome of defendant's trial would have differed. Moreover, defendant has failed to show, or even argue, that the proceedings were fundamentally unfair or unreliable.

*Thomas*, 2008 WL 4274401 at *3 (internal citations omitted).

The decision by the Michigan Court of Appeals rejecting this claim is neither contrary to, nor involves an unreasonable application of, clearly established federal law. It is likewise not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

IV.          **Prosecutorial Misconduct**

In his closing argument to the jury, the prosecutor made the following comments:

Once again, we get back to all the circumstantial evidence. How does he know Jermelle (sic) is not in Detroit? How does all this fit in terms of putting the defendant there? LaResha George in the white car, we know there's a white car. Ynes Lee, the defendant has the white car. All this fits suddenly when the defendant - or when Jermelle puts it together. That's an amazing coincidence. And the gunshot residue in the car.

Even if you take Jermelle - you could also take Jermelle's statements out of here. There is enough here on just the circumstantial evidence alone to convict this man of shooting his cousin, because that's what happened.

(Trial Transcript, February 2, 2007, 96-97).

Petitioner asserts that these comments were improper and violated his right to a fair trial in that such "tended to mislead or confuse the jury as to the sufficiency of evidence necessary to convict the defendant."

When a petitioner makes a claim of prosecutorial misconduct, "the touchstone of due process analysis...is the fairness of the trial, not the culpability of the prosecutor." *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1355 (6th Cir. 1993) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). The issue is whether the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Gillard v. Mitchell*, 445 F.3d 883, 897 (6th Cir. 2006) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). Thus, even if the challenged comments were improper, habeas relief is available only where the comments were "so flagrant as to render the entire trial fundamentally unfair." *Gillard*, 445 F.3d at 897.

When assessing whether alleged prosecutorial misconduct warrants relief, the Court undertakes a two part analysis. The Court must first determine whether "the prosecutor's conduct and remarks were improper." *Girts v. Yanai*, 501 F.3d 743, 758-59 (6th Cir. 2007). If such is the case, the Court must then determine "whether the impropriety was flagrant and thus warrants reversal." *Id.* at 759. When assessing whether an improper comment resulted in a denial of the right to a fair trial, the Court considers the following factors: (1) the likelihood that the comments mislead the jury or prejudiced the accused; (2) whether the comments were extensive or isolated; (3) whether the comments were deliberately or accidentally presented to the jury; and (4) whether the evidence against the accused was substantial. *Id.*

The Court discerns nothing improper in the prosecutor's comments. The prosecutor

26

did not say anything that a person could reasonably interpret as lessening or shifting the prosecutor's burden of proof.  The prosecutor was merely commenting on the strength of the evidence which he is permitted to do.  *See, e.g., United States v. Reliford*, 58 F.3d 247, 250-51 (6th Cir. 1995) ("[a] prosecutor in closing argument may review the evidence that has been presented, and may comment on the strength of the Government's proof, so long as these comments do not constitute improper vouching").  Moreover, even if the Court assumes that the prosecutor's comments were improper, the result is the same.  The comments were isolated.  Also, the trial court clearly instructed the jury that the attorneys' arguments were not evidence and that the prosecutor bore the burden of proving Petitioner's guilt beyond a reasonable doubt.  (Trial Transcript, February 2, 2007, 15-16, 21, 27-29).  Thus, it is unlikely that the comments in question mislead the jury or prejudiced Petitioner.

The Michigan Court of Appeals rejected Petitioner's argument on this issue, stating as follows:

> Defendant finally argues that the prosecutor's misconduct deprived him of a fair trial.  During his rebuttal closing argument, the prosecutor stated that even without the victim's testimony, there was enough circumstantial evidence to convict defendant.  Defendant contends that this argument misled the jury about the sufficiency of the evidence necessary to convict defendant.  This Court reviews de novo claims of preserved prosecutorial misconduct to determine whether a defendant was denied a fair and impartial trial.  Prosecutorial misconduct issues are decided on a case-by-case basis, and the reviewing court must examine the record and evaluate a prosecutor's remarks in context.  As a general rule, "[p]rosecutors are accorded great latitude regarding their arguments and conduct."  A prosecutor is entitled to argue the evidence and reasonable inferences arising from the evidence.

> The prosecutor argued the strength of the circumstantial evidence presented, which in this case was substantial.  The argument was entirely proper because it was based on the evidence.  We find that the jury was in no way misled about the evidence sufficient to convict defendant.  Also, any error in this regard was cured by the

27

trial court's instructions to the jury that statements and arguments of counsel are not evidence, and that it was the prosecutor's burden to prove defendant guilty beyond a reasonable doubt.

*Thomas*, 2008 WL 4274401 at *3-4 (internal citations omitted).

The decision by the Michigan Court of Appeals rejecting this claim is neither contrary to, nor involves an unreasonable application of, clearly established federal law. It is likewise not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that Thomas' petition for writ of habeas corpus be **denied**. The undersigned further recommends that a certificate of appealability be denied. *See Slack v. McDaniel*, 529 U.S. 473 (2000).

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date:  November 15, 2011                    /s/ Ellen S. Carmody
                                            ELLEN S. CARMODY
                                            United States Magistrate Judge


28